1
2
3
4                        UNITED STATES DISTRICT COURT
5                       NORTHERN DISTRICT OF CALIFORNIA
6
7    CARLOS A. HAWTHORNE,                    Case No.  17-cv-04960-HSG
8                    Plaintiff,             **ORDER GRANTING DEFENDANTS'**
                                            **MOTION FOR SUMMARY**
9              v.                           **JUDGMENT**
10   A YANEZ, et al.,                        Re: Dkt. No. 95
11                   Defendants.
12
13         Plaintiff, an inmate housed at California State Prison – Los Angeles County, has filed a *pro*
14   *se* complaint under 42 U.S.C. § 1983 against prison officials at San Quentin State Prison
15   ("SQSP"), where he was previously housed.  Now pending before the Court is Defendants' motion
16   for summary judgment.  Dkt. No. 95.  Plaintiff has filed an opposition, Dkt. No. 105, and
17   Defendants have filed a reply, Dkt. No. 105.  For the reasons set forth below, the Court GRANTS
18   Defendants' motion for summary judgment.
19                                   **DISCUSSION**
20   **I.      Procedural Background**
21         Plaintiff filed the original complaint in this action on or about August 25, 2017.  Dkt. No.
22   1.  On April 4, 2018, Plaintiff filed an amended complaint, which is the operative complaint,
23   adding S. Swensen as a defendant.  Dkt. No. 21.
24         On November 24, 2020, the Court screened the operative complaint (Dkt. No. 21), and
25   found that it stated cognizable claims against defendants Fonesca and Yanez for retaliation for
26   protected conduct in violation of the First Amendment; against defendants Czajkowski, Davis,
27   Deal, Hagens, Swensen, and Thomas for retaliation for protected conduct in violation of the First
28   Amendment and for denial of Plaintiff's First Amendment right to access the courts; against

United States District Court
Northern District of California

United States District Court
Northern District of California

defendants Czajkowski, Davis, Deal, Hagens, Swensen, and Thomas for denial of Plaintiff's First Amendment right to free exercise of religion; against defendants Czajkowski, Davis, Deal, Hagens, Swensen, and Thomas for denial of Plaintiff's First Amendment right to free exercise of speech; and against defendant Czajkowski for excessive use of force in violation of the Eighth Amendment and for denial of Plaintiff's First Amendment right to freedom of speech.  Dkt. No. 30.

On October 5, 2021, the Court dismissed defendant Deal from this action pursuant to the parties' joint stipulation.  Dkt. No. 63.

Defendant Swensen moved to dismiss the amended complaint, arguing that the claims against her were untimely, that Plaintiff had not adequately alleged her personal involvement, that she was entitled to qualified immunity, and that any property confiscation was reasonably related to a legitimate penological interest.  Dkt. No. 66.  Defendants Czajkowski, Davis, Fonesca, Hagens, Thomas, and Yanez moved for summary judgment for failure to exhaust administrative remedies with respect to the claims against defendants Fonesca, Davis, Hagens, and Czajkowski; and with respect to the free exercise of religion and free speech claims against defendant Thomas. Dkt. No. 67.

On March 7, 2022, the Court denied defendant Swensen's motion to dismiss, granted summary judgment in favor of defendants Fonesca, Davis, Hagens, and Czajkowski on all claims, and granted summary judgment in favor of defendant Thomas on the First Amendment free exercise and free speech claims.  The Court dismissed defendants Fonesca, Davis, Hagens, and Czajkowski from this action.  *See generally* Dkt. No. 81.

The claims currently remaining in this action are as follows: (1) defendant Yanez discovered and read Plaintiff's draft federal civil rights complaint and, in retaliation for this protected conduct, confiscated the complaint and reported it to Plaintiff's mental health team, in violation of the First Amendment; (2) defendants Swensen and Thomas directed custodial staff to confiscate Plaintiff's property, including his legal documents and the drafted federal complaint, in retaliation for Plaintiff's protected conduct, in violation of Plaintiff's First Amendment right to access the courts and to engage in protected conduct without suffering retaliation; (3) defendant

2

Swensen confiscated Plaintiff's religious books and items, in violation of Plaintiff's First Amendment right to free exercise of religion; and (4) defendant Swensen confiscated Plaintiff's books and magazines, in violation of Plaintiff's First Amendment right to free exercise of speech. *See generally* Dkt. Nos. 81, 89.

## II. Factual Background

### A. SQSP Psychiatric Inpatient Program ("PIP")

During the relevant time period, the SQSP PIP provided inpatient mental health treatment services for condemned inmate-patients who required 24-hour inpatient care and treatment for mental health disorders. Dkt. No. 95-10 ("Thomas Decl.") at ¶ 3. Inmates housed in the PIP received either "Non-Acute" level of care ("LOC") services or "Acute" level of care services. Thomas Decl. ¶ 5. Non-Acute LOC was provided through the PIP's Intermediate Treatment Program ("ITP"). Thomas Decl. ¶ 6. "Acute" LOC services were provided through the PIP's Acute Treatment Program ("ATP") and constituted a higher level of care than the ITP. Thomas Decl. ¶ 5. The interdisciplinary treatment team ("IDTT") determined an inmate's LOC. Thomas Decl. ¶ 7. The IDTT is composed of medical, clinical, and correctional staff, and the inmate-patient. Thomas Decl. ¶ 8. The medical and clinical component of the IDTT is comprised of psychologists, psychiatrists, nurse practitioners, social workers, recreation therapists, and psychiatric technicians. Thomas Decl. ¶ 8. The IDTT's purposes are to identify symptoms that need to be addressed in treatment, identify treatment goals, establish treatment plans, evaluate the effectiveness of treatment plans, identify barriers to meeting treatment goals, review and modify treatment plans and services as needed, and determine the appropriate level of care. Thomas Decl. ¶ 8. The IDTT met weekly with inmates. Sometimes the IDTT would hold an additional meeting, referred to as a "MEGA" session, to discuss variations in care or emergent issues experienced by the inmate-patient. Thomas Decl. ¶ 9. An inmate's ability to possess personal property in the PIP, both the amount of property and the type of property, was determined by his LOC, his IDTT decision/individualized treatment plan, and custody policy. Thomas Decl. ¶ 13.

Correctional officials were required to have direct and unobstructed line of sight view of inmate-patients. Thomas Decl. ¶¶ 11, 12. When healthcare staff identified an inmate-patient as

United States District Court
Northern District of California

1    actively suicidal and in immediate danger of self-harm, the inmate-patient was placed on Suicide

2    Watch status, which required correctional officials to maintain a continuous direct and

3    unobstructed line of sight views of the inmate-patient.  This was referred to as "One-to-One (1:1)

4    Observation."  Thomas Decl. ¶ 10.  Inmate-patients not on Suicide Watch status needed to be

5    observed every fifteen minutes.  Thomas Decl. ¶ 11.

6         The parties disagree as to the PIP policy regarding covering cell windows.  Plaintiff

7    alleges that PIP policy only prohibited inmates on suicide watch from covering their windows.

8    Dkt. No. 21 ("FAC") at 1 and 7; Dkt. No. 102 at 10, 22.  Defendants allege that the PIP prohibited

9    all inmates from obstructing the view into their cells by placing materials over any portion of their

10   cell window because coverings prevented staff from looking into an inmate-patient's cell to

11   observe any dangerous situations (self-harm attempts, erratic behavior) and from continually

12   assessing the inmate-patient's condition.  Thomas Decl. ¶ 12.

13       **B.      Plaintiff's Mental Health History**

14       Plaintiff is a condemned inmate.  Plaintiff reports having attempted suicide over 30 times,

15   including an attempted overdose while housed in Los Angeles County Jail and an attempted

16   hanging in or about 2009.  Trenbeath Decl., Ex. B, AGO 010 (Dkt. No. 95-13 at 14).  In

17   November 2015, after he was discharged from SQSP PIP, Plaintiff cut both wrists to ensure his

18   return to the PIP.  Trenbeath Decl., Ex. B at AGO 001, 010, 014 (Dkt. No. 95-14 at 5, 14, 18).  On

19   November 25, 2015, Plaintiff was admitted to the PIP at the intermediate level of care (ITP).

20   Trenbeath Decl., Ex. B at AGO 001, 010 (Dkt. No. 95-14 at 5, 14).

21       During this stay in the PIP, Plaintiff engaged in self-harm at least two times.

22       The first incident took place on April 10, 2016, when Plaintiff attempted suicide by cutting

23   two main arteries.  Plaintiff was sent to Marin General Hospital and his cuts were sutured.

24   Trenbeath Decl., ¶ 3 and Ex. B at AGO 002-004 (Dkt. No. 95-13 at 6-8).  Upon his return to the

25   PIP, Plaintiff's doctors increased his LOC to "acute," placed him on 1:1 observation (suicide

26   watch), and required him to wear a safety smock.  Trenbeath Decl., Ex. B at AGO 005 (Dkt. No.

27   95-13 at 9).

28       The second incident took place on the night of August 25, 2016, when Plaintiff again

United States District Court
Northern District of California

1   attempted suicide, this time by cutting his left arm.  The physician on duty placed Plaintiff on 1:1

2   suicide watch with a no tear blanket, no tear mattress and no tear smock, and increased Plaintiff's

3   level of care from Stage 3 to Acute LOC.  Trenbeath Decl., Ex. B at AGO 001, 009-015 (Dkt. No.

4   95-13 at 5, 13-19, 71); Dkt. No. 950-13 at 59-76 ("Hawthorne Depo.") at 77:7-80:19.

5       **C.      Plaintiff's 2015-2016 PIP Stay**

6       Sometime prior to August 25, 2016, Plaintiff filed a grievance alleging that mental health

7   services personnel and other prison officials were discriminating against him.  Plaintiff was

8   unsuccessful in obtaining relief through the administrative grievance process, so he drafted a

9   federal civil rights complaint regarding these issues.  Plaintiff alleges that his draft complaint was

10  a rough draft of the complaint for this action, and that he wrote two copies of this draft complaint.

11  FAC at 1-2; Hawthorne Depo. 47:3-25; 71:2-73:11 (Dkt. No. 95-13 at 66-69); Dkt. No. 102 at 10,

12  13-14.

13      While housed in the PIP, Plaintiff frequently covered his cell windows with papers or

14  paper bags.  Thomas Decl. ¶ 16; Yanez Decl. ¶ 5.  From August 12, 2016 through September 8,

15  2106, PIP staff documented twelve occasions when Plaintiff covered his cell windows with

16  articles of paper, limiting their visibility into his cell.  Trenbeath Decl., Ex. B at AGO 036 – AGO

17  047 (Dkt. No. 95-13 at 40-51) (noting that Plaintiff covered his windows on 8/12, 8/23-8/25, 8/30,

18  9/1-9/4, 9/6-9/8).  According to Plaintiff, he only covered ten percent of his windows, and solely

19  for the purpose of providing himself privacy when he was bathing or using the toilet.  Plaintiff was

20  never a threat to himself.  Plaintiff was not on suicide watch during the relevant time period.  If he

21  had been on placed on suicide watch during the relevant time period, it was a retaliatory measure

22  taken by correctional officials and his treatment team to punish him for filing the grievance

23  alleging discrimination by his treatment team.  Dkt. No. 102 at 13-14, 29.

24      On several occasions, defendant Thomas and Plaintiff's IDTT team reminded Plaintiff that

25  PIP policy prohibited covering windows and informed Plaintiff that he needed to remove the

26  papers from his cell windows.  Thomas Decl. ¶¶ 17, 19 and Ex. A; Trenbeath Decl. ¶ 3 and Ex. B

27  at AGO 036-047 (Dkt. No. 93-13 at 40-51).

28      On August 25, 2016, Plaintiff engaged in self-harm by cutting his left arm with a sharp

United States District Court
Northern District of California

object.  Healthcare staff discovered the self-harm around 10:13 p.m. that night.  Trenbeath Decl.,
Ex. B at AGO 001, 009-015 (Dkt. No. 95-13 at 5, 13-19, 71); Hawthorne Depo. 77:7-80:19.  The
physician on duty that night was notified on or about 10:44 p.m., and the physician placed Plaintiff
on 1:1 suicide watch.  Trenbeath Decl., Ex. B at AGO 009, 013 (Dkt. No. 95-13 at 13, 17).
Healthcare staff determined that Plaintiff had made the cuts with a piece of plastic cup and
removed property from his cell on or about August 26, 2016 at 12:20 a.m.  Trenbeath Decl., Ex. B
at AGO 009 (Dkt. No. 95-13 at 13).

The parties disagree as to whether Defendant Yanez participated in the August 26, 2016
property removal.  Plaintiff alleges that, on or about August 26, 2016, during a cell search,
defendants Fonesca and Yanez discovered his draft complaint and confiscated it, also confiscating
Plaintiff's attorney-client communications and other legal documents.  FAC at 4.  It is unclear if
the alleged cell search is the same incident as the property removal on August 26, 2016 at 12:20
a.m., or if Plaintiff is referring to a different event that happened later that day.  Plaintiff also
alleges that he believes that correctional officer Maneja informed defendants Yanez, Thomas and
Swensen about his intent to sue correctional officers, as evidenced by his draft complaint.  Dkt.
No. 102 at 16.  Defendant Yanez does not recall participating in this removal of property from
Plaintiff's cell.  Yanez Decl., ¶ 6.  Although correctional officers are required to document
property removed from an inmate's cell on a property receipt, there is no property receipt in the
record for the August 26, 2016 property removal.  Yanez Decl. ¶ 6.

On the morning of August 26, 2016, Plaintiff's treatment team met to address the prior
day's self-harm incident and to initiate a stage change from an intermediate level of care (ITP
LOC) to an acute level of care (Acute LOC).  Trenbeath Decl., Ex. B at AGO 014-020 (Dkt. No.
95-13 at 18-24).  The treatment team placed Plaintiff on property restrictions, limiting him to the
following personal property in his cell: mattress, blanket, smock, and eating utensils made from
cardboard or paper.  Trenbeath Decl., Ex. B at AGO 014, 021 (Dkt. No. 95-13 at 18, 25).
Defendant allege that the property restriction was for Plaintiff's safety.  *Id.*  Plaintiff alleges that
the property restriction was because defendants Sanchez, Thomas and Yanez had learned that
Plaintiff had drafted a federal civil rights complaint.  Dkt. No. 102 at 16.

1    On August 31, 2016, another IDTT meeting was held.  At this meeting, the treatment team

2    directed staff to remove all the papers that Plaintiff had used to partially block his windows, and to

3    not allow Plaintiff to possess paper towels, paper lunch bags, and other papers in his cell because

4    he had previously used these types of papers to cover his windows.  Trenbeath Decl., Ex. B at

5    AGO 023, 030 (Dkt. No. 95-13 at 27, 34).

6    On September 8 or 9, 2016,[1] defendant Thomas and Plaintiff's treatment team directed

7    custody staff to remove all loose papers from Plaintiff's cell that day.  Plaintiff was allowed to

8    have 50 minutes, twice a day, in the therapeutic module to access his legal materials and to use

9    loose paper and pen, with the support of a Psych Tech.  Trenbeath Decl., Ex. B at AGO 032 (Dkt.

10   No. 95-13 at 36); Thomas Decl. ¶ 17 and Ex. A.  In response to Plaintiff's privacy concerns,

11   Plaintiff was informed that he could request a screen from the nurse to use when using the

12   restroom.  Trenbeath Decl., Ex. B at AGO 033 (Dkt. No. 95-13 at 37).

13   The parties disagree as to why the loose papers were removed from Plaintiff's cell.

14   Defendants allege that they removed the loose papers because Plaintiff continued to cover his

15   windows with paper despite being instructed to stop and because staff was unable to view him

16   when the windows were covered.  Trenbeath Decl., Ex. B at AGO 032 (Dkt. No. 95-13 at 36);

17   Thomas Decl. ¶ 17 and Ex. A.  Plaintiff alleges that the property restriction was because defendant

18   Bensimon falsely reported that he was covering all of his windows and because Defendants were

19   retaliating against him for filing a grievance against defendants Swensen, Thomas, and Yanez.

20   Plaintiff alleges that the property restriction and the false reports were part of a conspiracy against

21   him.  Dkt. No. 102 at 23, 32, 34.

22   That same day, defendant Thomas observed custody staff remove a large cache of paper

23

24   _____

25   [1] The record is unclear as to when the MEGA meeting took place and when the property was
     removed pursuant to the treatment team's decision at the MEGA meeting.  In the summary
     judgment motion, Defendants state that MEGA meeting took place on September 8, 2016, and
26   loose papers were removed from Plaintiff's cell that same day.  Dkt. No. 95 at 17.  The allowable
     items chrono is also dated September 8, 2016, and the related progress notes that the meeting and
27   property removal took place on September 8, 2016.  Dkt. No. 95-11 at 2; Dkt. No. 95-13 at 36.
     However, Plaintiff alleges that the treatment team meeting and property removal took place on
28   September 9, 2016, and another set of progress notes regarding this MEGA session is dated
     September 9, 2016.  FAC at 5-6.

United States District Court
Northern District of California

bags and loose papers from Plaintiff's cell, which included Plaintiff's legal documents, draft complaint, religious books and items, and books and magazines.  Thomas Decl. ¶¶ 18-19 and Ex. A; FAC at 5-6.  Defendant Thomas denies being aware of the content of the loose papers and denies being aware that the loose papers included a draft federal civil rights complaint.  Thomas Decl. ¶ 18 and Ex. A.

### D.   CDCR Grievance Process

During the relevant time period, the California Department of Corrections and Rehabilitation ("CDCR") provided inmates with the administrative grievance process set forth in the version of 15 Cal. Code §§ 3084-3086 in effect at that time.[2]  The CDCR provided its inmates the right to appeal administratively "any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare."  15 Cal. Code Regs. § 3084.1(a) (2016).

Prior to September 1, 2017, the same grievance process applied to both custody issues and healthcare issues.  The grievance process required a prisoner to use a CDCR Form 602 "to describe the specific issue under appeal and the relief requested" by stating all facts known and available regarding the issue and by listing all staff member(s) involved and describing their involvement in the issue.  15 Cal. Code Regs. § 3084.2(a) (2016).  A grievance was reviewed at three different levels: (1) a first formal level filed with one of the institution's appeal coordinators, (2) a second formal level filed with the institution head or designee, and (3) a third formal level.  15 Cal. Code Regs. §§ 3084.7, 3084.8 (2016).  The CDCR's Office of Appeals ("OOA") received, reviewed, and maintained all final-level appeals for non-healthcare issues, while the Health Care

---

[2] Starting September 1, 2017, 15 Cal. Code Regs. § 3087 was amended to create a separate system for addressing healthcare grievances.  15 Cal. Code Regs. § 3087.1 *et seq.* (2017).  Pursuant to this system, healthcare grievances were grieved using the CDCR Form 602 HC and were only subject to two levels of review:  an institutional level of review and a headquarters level of review, with the headquarters level of review exhausting administrative remedies.  15 Cal. Code Regs. § 3087.1(a)(1), (g).

In 2020, there was a significant overall restructuring of the entire grievance process.  On March 25, 2020, and effective June 1, 2020, 15 Cal. Code Regs. §§ 3084–3084.9 were repealed and replaced with renumbered and amended provisions at sections 3480 through 3487. The primary change was a reduction of the levels of review for non-healthcare appeals from three levels to two levels, with the first level now referred to as a grievance and the second level referred to as an appeal.  *See, e.g.,* 15 Cal. Code Regs. §§ 3481 *et seq* (2020).

United States District Court
Northern District of California

1    Correspondence and Appeals Branch ("HCCAB") received, reviewed, and maintained all final-

2    level appeals for healthcare issues (medical, dental, and mental health).  Dkt. No. 95-5 ("Moseley

3    Decl."), at ¶ 2.  Pursuing a grievance through the third and final level satisfied the exhaustion

4    requirement set forth in 42 U.S.C. § 1997e(a).  15 Cal. Code Regs. § 3084.1(b) (2016).  A

5    grievance could be cancelled for any of the following reasons: (1) the action or decision being

6    appealed is not within the jurisdiction of the department; (2) the grievance duplicates a prior

7    grievance upon which a decision has been rendered or is pending; or (3) the inmate continues to

8    submit a rejected grievance while disregarding grievance staff's previous instructions to correct

9    the grievance.  15 Cal. Code Regs. §§ 3084.6(c)(1)-(11) (2016).  A cancellation or rejection

10   decision does not exhaust administrative remedies.  15 Cal. Code Regs. § 3084.1(b) (2016).

   **E.      Plaintiff's Relevant Grievance History**

12         Between August 26, 2016, when the alleged retaliation happened, and April 4, 2018, the

13   date the operative complaint was docketed, Plaintiff submitted twenty-eight non-healthcare related

14   grievances.[3]  Tafoya Decl., ¶ 8 and Exs. A-AA.  The Court only considers grievances that were

15   pursued to the third and final level, because California inmates must receive a third level decision

16   on their grievances to satisfy the Prison Litigation Reform Act ("PLRA")'s exhaustion

17   requirement.  15 Cal. Code Regs. § 3084.1(b) (2016).  Of the twenty-eight non-healthcare related

18   grievances filed during the relevant time period, only fourteen received a final decision at the third

19   level.[4]  Tafoya Decl., ¶ 8 and Ex. A; Mosely Decl., ¶ 8 and Exs. A-O.

20         None of these fourteen grievances reference defendant Swensen.  Mosely Decl., ¶ 8 and

21   Exs. B-O.

---

[3] Of these twenty-eight grievances, two of them, Grievance No. SQ-C-17-00715 and Grievance NO. SQ-D-18-01101, have not been located.  Plaintiff has not alleged that these two grievances exhausted his administrative remedies for this action.  The categorization of these two grievances indicates that they likely concerned issues other than the alleged retaliation.  Prison records indicate that Grievance No. SQ-C-17-00715 was categorized as an ADA issue and Grievance NO. SQ-D-18-01101 was categorized as a "program" issue.  A "program" issue usually pertains to: Athletic or Recreational Program, In Cell Study Program, Inmate Council and Other Inmate Group, Inmate Publication, Movie and Video, Reentry Program, Substance Abuse Program, Vocational Issues (involving job or pay issues), or other activities to inmates at the institution. Tafoya Decl. ¶¶ 5, 9.
[4] The remaining twelve grievances were either denied, cancelled, or rejected at the first or second level of review.  *See generally* Tafoya Decl. ¶ 8 and Exs. A, D, H, I, J, L-N, P, U, W, Y, Z.

United States District Court
Northern District of California

Of these fourteen grievances, six of these grievances reference defendant Yanez:

Grievance Nos. SQ-I-16-02339, SQ-J-16-02691, SQ-C-17-00862, SQ-D-17-01079, SQ-S-17-

03056, and SQ-S-17-03138.  None of these grievances allege that defendant Yanez confiscated

Plaintiff's legal documents on or about August 26, 2016.

In Grievance No. SQ-I-16-02339, Plaintiff alleges that on August 25, 2016, he attempted

to commit suicide by cutting his main artery because defendant Yanez conducted a strip search of

his person, stared at Plaintiff's genitals, and then had the nerve to laugh and say, "thank you."

Tafoya Decl., Ex. B. (Dkt. No. 95-8 at 28-41); Moseley Decl., Ex. B.

In Grievance No. SQ-J-16-02691, Plaintiff alleges that, after his property was confiscated

by defendant Yanez under the direction of Dr. Thomas, defendant Yanez removed Plaintiff's legal

materials and would not return them; correctional officers Edwards, Pitts, Gomez, and Walls

maintained the chain of custody of these legal materials and were also refusing to return them; and

that he feared retaliation from these officers for his exercise of his First Amendment rights.

Tafoya Decl., Ex. C (Dkt. No. 95-8 at 49-66); Moseley Decl., Ex. C.

The remaining four grievances do not exhaust the claims in this action.  These four

grievances grieve actions taken by defendant Yanez months after the relevant events.[5]

None of these fourteen grievances grieve property confiscation on August 26, 2016 or

September 9, 2016.  Although Grievance No. SQ-J-16-02691 concerns Plaintiff's property, the

allegation in this grievance is that after Plaintiff's property was removed from his cell, defendant

Yanez removed Plaintiff's legal documents from Plaintiff's property and refuses to return these

---

[5] In Grievance No. SQ-C-17-00862, Plaintiff stated that he was going to commit suicide because
defendant Yanez continued to harass him in retaliation for Plaintiff filing Grievance No. SQ-16-
02339, by confiscating his property without allowing him to mail the property home or donate it.
Tafoya Decl., Ex. G; Moseley Decl., Ex. F.  In Grievance No. SQ-D-17-01079, Plaintiff alleged
that on March 31, 2017, defendant Yanez and correctional officer Vasquez confiscated his
package after he skipped three meals even though he informed them that he was not on a hunger
strike.  Tafoya Decl., Ex. K; Moseley Decl., Ex. G.  In Grievance No. SQ-S-17-03056, Plaintiff
alleged that on October 20, 2017, defendant Yanez yelled at him to shut up, that defendant Yanez
had been harassing by searching his cell and issuing false rules violation reports against him, and
that defendant Yanez was trying to determine whether Plaintiff is suing him.  Tafoya Decl., Ex. R;
Moseley Decl., Ex. J.  In Grievance No. SQ-S-17-03138, Plaintiff alleged that defendant Yanez
and correctional officer Baker violated his rights on September 10, 2017.  Tafoya Decl., Ex. T;
Moseley Decl., Ex. K.

United States District Court
Northern District of California

1   documents to Plaintiff.  Tafoya Decl., Ex. C (Dkt. No. 95-8 at 49-66); Moseley Decl., Ex. C.

2          **F.      Defendant Yanez**

3          In August and September of 2016, defendant Yanez was assigned as a third watch (2:00

4   p.m. to 10:00 p.m.) infirmary officer at the SQSP PIP in San Quentin.  Yanez Decl. ¶ 2.  At times,

5   defendant Yanez would cover another correctional officer's shift during second watch (6:00 a.m.

6   to 2:00 p.m.).  Yanez Decl. ¶ 2.  Defendant Yanez was not on duty from 10:00 p.m. on August 25,

7   2016 through 6:00 a.m. on August 26, 2016.  Cervantes Decl. ¶¶ 4, 6, Ex. A; Yanez Decl. ¶ 6.

8   **III.   Summary Judgment Motion**

9          Defendants argue that defendant Swensen is entitled to summary judgment because

10  Plaintiff has not exhausted his claims against her.  Defendants argues that defendant Yanez is

11  entitled to summary judgment because defendant Yanez was not on duty the day the complaint

12  was allegedly confiscated; if he had confiscated the complaint, it was in response to a clinician's

13  orders; and the alleged confiscation did not have a chilling effect.  Defendants argue that

14  defendant Thomas is entitled to summary judgment on the retaliation claims because there is no

15  evidence that defendant Thomas was aware of a draft civil rights complaint among Plaintiff's

16  papers, the directive to remove the loose papers advanced a legitimate penological goal, and there

17  was no chilling effect of harm.  Defendants argue that defendant Thomas is entitled to summary

18  judgment on Plaintiff's access-to-the-courts claim because there was no actual injury.  In the

19  alternative, Defendants argue that they are entitled to qualified immunity.  *See generally* Dkt. Nos.

20  95, 105.

21         In his opposition, Plaintiff argues the following.  Plaintiff argues that he has pled sufficient

22  factual content to allow the Court to draw the reasonable inference that defendant Swensen

23  violated the First Amendment; that Defendants removed his property on September 9, 2016, in

24  retaliation for filing a grievance against defendants Yanez, Thomas, and Swensen alleging

25  discriminatory treatment; that the property control deprived him of his right to access the courts,

26  his right to free exercise of religion, and his right to free speech.  Plaintiff further argues that the

27  property removal had no valid, rational connection to prison discipline and security because,

28  during the relevant time period, Plaintiff was not a threat to himself or to others.  Plaintiff argues

United States District Court
Northern District of California

11

that the property removal was done with the intent to deprive him of his First Amendment right to exercise his religion and receive publications, and was motivated solely by a spiteful effort to retaliate against him for exercising protected conduct.  Plaintiff argues that in implementing the property removal, defendants Yanez, Thomas and Swensen failed to exercise the requisite care to ensure that Plaintiff's rights were not violated, subjected him to an atypical and significant hardship, and violated the Equal Protection Clause.  *See generally* Dkt. No. 102.

### A.   Summary Judgment Legal Standard

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(a) (2014).  Material facts are those that may affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A disputed fact is "material" where the resolution of that fact "might affect the outcome of the suit under the governing law," and the dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  The burden of establishing the absence of a genuine issue of material fact lies with the moving party, and the moving party may meet this burden with arguments or evidence or both.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party satisfies its burden, the burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *See id.* at 324 (citing Fed. R. Civ. P. 56(e)).  The non-moving party must show that there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 250.  The nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The nonmoving party must provide more than a "scintilla" of contradictory evidence to avoid summary judgment.  *Anderson*, 477 U.S. at 251–52; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion

United States District Court
Northern District of California

United States District Court
Northern District of California

1   by (1) citing to particular parts of materials in the record; or (2) showing that the materials cited do

2   not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce

3   admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1).  If a party fails to properly

4   support an assertion of fact or fails to properly address another party's assertion of fact as required

5   by Rule 56(c), the court may, *inter alia*, (1) consider the fact undisputed for purposes of the

6   motion; or (2) grant summary judgment if the motion and supporting materials--including the facts

7   considered undisputed--show that the movant is entitled to it.  Fed. R. Civ. P. 56(e).

8        A court shall grant summary judgment "against a party who fails to make a showing

9   sufficient to establish the existence of an element essential to that party's case, and on which that

10  party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an

11  essential element of the nonmoving party's case necessarily renders all other facts immaterial."

12  *See Celotex Corp.*, 477 U.S. at 322–23.

13       The court's function on a summary judgment motion is not to make credibility

14  determinations or weigh conflicting evidence with respect to a disputed material fact.  *See T.W.*

15  *Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence must

16  be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the

17  facts must be viewed in a light most favorable to the nonmoving party.  *See id.* at 631.  If the

18  evidence produced by the moving party conflicts with evidence produced by the nonmoving party,

19  the court must assume the truth of the evidence submitted by the nonmoving party.  *See Leslie v.*

20  *Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

21      **B.**    **Claim Against Defendant Swensen**

22      **1.**    **PLRA Exhaustion Requirement**

23       The PLRA sets forth the following exhaustion requirement: "No action shall be brought

24  with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner

25  confined in any jail, prison, or other correctional facility until such administrative remedies as are

26  available are exhausted."  42 U.S.C. § 1997e(a).  The PLRA's exhaustion requirement is

27  mandatory.  *Jones v. Bock*, 549 U.S. 199, 211 (2007).  The administrative remedies need not be

28  plain, speedy, and effective; need not satisfy minimum federal standards, and need not be capable

1   of providing the form of relief sought.  *Ross v. Blake*, 136 S. Ct. 1850, 1858, (2016) (citing to

2   *Porter v. Nussle*, 534 U.S. 516, 524 (2002) and *Booth v. Churner*, 532 U.S. 731, 741 (2001)).

3          The PLRA requires "proper exhaustion" of available administrative remedies.  *Woodford*

4   *v. Ngo*, 548 U.S. 81, 93 (2006).  Proper exhaustion requires using all steps of an administrative

5   process and "demands compliance with an agency's deadlines and other critical procedural rules

6   because no adjudicative system can function effectively without imposing some orderly structure

7   on the course of its proceedings." *Id.* at 90–91.  Compliance with prison grievance procedures is

8   all that is required by the PLRA to "properly exhaust." *Jones*, 549 U.S. at 217–18.  The level of

9   detail necessary in a grievance to comply with the grievance procedures will vary from system to

10  system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the

11  boundaries of proper exhaustion. *Id.* at 218.

12         Failure to exhaust under the PLRA is an affirmative defense that the defendant must plead

13  and prove. *Jones*, 549 U.S. at 204, 216.  The defendant's burden is to prove that there was an

14  available administrative remedy and that the prisoner did not exhaust that available administrative

15  remedy. *Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014).  Once the defendant has carried that

16  burden, the burden shifts to the prisoner to come forward with evidence showing that there is

17  something in his particular case that made the existing and generally available administrative

18  remedies effectively unavailable to him. *Id.* at 1172.  If undisputed evidence viewed in the light

19  most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary

20  judgment under Rule 56. *Albino*, 747 F.3d at 1166.  But if material facts are disputed, summary

21  judgment should be denied, and the district judge rather than a jury should determine the facts in a

22  preliminary proceeding. *Id.*  A prisoner must provide evidence, not just make conclusory

23  allegations, to meet his burden to show that existing and generally available administrative

24  remedies were effectively unavailable. *See Draper v. Rosario*, 836 F.3d 1072, 1079-80 (9th Cir.

25  2016).  But as required by *Jones*, the ultimate burden of proof remains with the defendant. *Albino*,

26  747 F.3d at 1172.

27              **2.     Analysis**

28         Plaintiff claims that defendant Swensen directed custodial staff to confiscate his property,

*United States District Court*
*Northern District of California*

1    including his legal documents and the drafted federal complaint, in retaliation for his protected

2    conduct, in violation of his First Amendment right to access the courts and right to engage in

3    protected conduct without suffering retaliation; and that the property confiscation deprived him of

4    his religious books, religious items, books, and magazines, in violation of his First Amendment

5    right to free exercise of religion and his First Amendment right to free exercise of speech.  *See*

6    *generally* Dkt. Nos. 81, 89.  Defendants argue that defendant Swensen is entitled to summary

7    judgment for failure to exhaust administrative remedies because Plaintiff has not filed any

8    grievance against defendant Swensen.  *See* Dkt. No. 95 at 22-24.  Plaintiff has not addressed this

9    argument.[6]

10        The undisputed evidence shows that Plaintiff has failed to exhaust his administrative

11   remedies against defendant Swensen.  None of the grievances filed by Plaintiff during the relevant

12   time period (August 25, 2016, when the alleged retaliation happened, and April 4, 2018, the date

13   the operative complaint was docketed) name defendant Swensen or grieve property confiscation

14   on September 8 or 9, 2016.  The Court therefore GRANTS summary judgment in favor of

15   defendant Swensen for failure to exhaust administrative remedies.  The claims against defendant

16   Swensen are DISMISSED without prejudice to bringing a new action after Plaintiff has exhausted

17   his administrative remedies.

18        **C.    Claims Against Defendants Yanez and Thomas**

19            **1.    Retaliation Claims Against Defendants Yanez and Thomas**

20                **a.    Legal Standard**

21        Within the prison context, a viable claim of First Amendment retaliation entails five basic

22   elements: (1) An assertion that a state actor took some adverse action against an inmate

23   (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's

---

[6] Plaintiff's opposition focuses on whether he adequately pled his claims against defendant
Swensen and the legal standard for reviewing a motion to dismiss, arguing that he has adequately
alleged defendant Swensen's personal participation in the constitutional violations.  Dkt. No. 102
at 1-4, 15-16.  The relevant issue raised in Defendants' summary judgment motion is not whether
the claims against defendant Swensen are adequately pled, but whether Plaintiff has exhausted his
administrative remedies for his claims against defendant Swensen, as required by the Prison
Litigation Reform Act.

United States District Court
Northern District of California

exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal. *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). With respect to the fifth factor, the prisoner bears the burden of pleading and proving absence of legitimate correctional goals for the conduct of which he complains. *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995) (prisoner suing prison officials under Section 1983 for retaliation must allege that he was retaliated against for exercising his constitutional rights and that retaliatory action did not advance legitimate penological goals, such as preserving institutional order and discipline). At that point, the burden shifts to the prison official to show, by a preponderance of the evidence, that the retaliatory action was narrowly tailored to serve a legitimate penological purpose. *See Schroeder v. McDonald*, 55 F.3d 454, 461-62 (9th Cir. 1995) (defendants had qualified immunity for decision to transfer prisoner to preserve internal order and discipline and maintain institutional security). Striving to protect prisoners from harm is a legitimate penological interest. *Shepard v. Quillen*, 840 F.3d 686, 692 (9th Cir. 2016).

The court should apply the four-factor test from *Turner v. Safley*, 482 U.S. 78 (1978), to determine whether the proffered legitimate penological interest is reasonably related to a regulation which infringes on a prisoner's constitutional rights even in a retaliation analysis. *See Brodheim v. Cry*, 584 F.3d 1262, 1272 (9th Cir. 2009). In *Turner*, the Supreme Court laid out a four-factor test to determine whether a prison regulation is reasonably related to legitimate penological interests: (1) whether the regulation is rationally related to a legitimate and neutral governmental objective, (2) whether there are alternative avenues that remain open to the inmates to exercise the right, (3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and (4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials. *Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005) (internal quotation marks and citations omitted). Prison officials cannot simply articulate a general justification for their actions: they must show why their particular action was reasonably related to the legitimate interest. *Shephard*, 840 F.3d at 692 (defendants must show that they placed plaintiff in administrative segregation because there were witnesses in general population that he could have

1    improperly influenced; not enough to simply assert that administrative segregation generally helps

2    keep prisoners safe and investigations untainted).  Courts must also consider whether there were

3    ready alternatives to the allegedly retaliatory action for achieving the governmental objectives.

4    *Brodheim*, 584 F.3d at 1272.

5                                    **b.      Analysis**

6            The remaining First Amendment retaliation claims against defendants Yanez and Thomas

7    are that they retaliated against Plaintiff for preparing a draft federal civil rights complaint as

8    follows.  On or about August 26, 2016, defendant Yanez confiscated the draft complaint and

9    reported it to Plaintiff's mental health team.  On or about September 8 or 9, 2016, defendant

10   Thomas directed custodial staff to confiscate Plaintiff's property, including his legal documents

11   and the draft complaint.

12           Viewing the record in the light most favorable to Plaintiff, the Court finds that Plaintiff has

13   not demonstrated a triable issue of material fact as to whether defendants Yanez and Thomas

14   engaged in First Amendment retaliation.

15           With respect to defendant Yanez, the record indicates that the August 26, 2016 property

16   removal happened during first watch, at 12:20 a.m., when defendant Yanez was not on duty.

17   Plaintiff does not dispute that defendant Yanez was not working at the time of the property

18   removal, and he has not alleged that there was a second property removal later that day.  There is

19   no evidence in the record that defendant Yanez was present when property was removed from

20   Plaintiff's cell on August 26, 2016.  Nor is there evidence in the record that creates a genuine

21   factual dispute as to whether defendant Yanez knew of the draft complaint.  Plaintiff now alleges

22   that he believes that correctional officer Maneja informed defendants Yanez, Thomas and

23   Swensen of his litigation activity.  Plaintiff provides no details supporting this allegation.  He does

24   not identify when or how correctional officer Maneja allegedly learned of his litigation activity,

25   and when officer Maneja informed defendants Yanez, Thomas and Swensen of his litigation

26   activity.  Plaintiff's "uncorroborated and self-serving" testimony cannot create a genuine issue of

27   material fact as to whether defendant Yanez knew of Plaintiff's protected conduct.  *Villiarimo v.*

28   *Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).  Plaintiff has not provided evidentiary

1   support for his assertion that defendant Yanez knew of his protected conduct.  Accordingly, the

2   Court GRANTS summary judgment in favor of defendant Yanez on the retaliation claim.

3          With respect to defendant Thomas, the Court finds that Plaintiff has not demonstrated a

4   triable issue of material fact as to either the second or the fifth factor of a First Amendment

5   retaliation claim.

6          Plaintiff has identified his protected conduct as preparing the draft civil rights complaint.

7   However, the record does not support a finding that defendant Thomas knew of the draft civil

8   rights complaint.  Plaintiff has alleged that his medical team, which presumably includes

9   defendant Thomas, learned of his protected conduct when defendant Yanez discovered the draft

10  complaint on August 26, 2016, and informed the medical team.  But according to the record before

11  the Court, defendant Yanez was not involved in the August 26, 2016 property removal because he

12  was not working when the property was removed, and, as discussed above, Plaintiff has not

13  provided any evidentiary support for his claim that correctional officer Maneja informed

14  defendants Yanez, Thomas and Swensen of his litigation activity.

15         Plaintiff also has not demonstrated a triable issue of material fact as to whether the

16  property confiscation reasonably advanced the legitimate correctional goal of ensuring Plaintiff's

17  safety.  Even viewing the record in the light most favorable to Plaintiff, it is clear that Plaintiff was

18  at risk of self-harm during the relevant time period.  Plaintiff's claim that during the relevant time

19  period he was never at risk of self-harm is directly contradicted by both his deposition testimony

20  and health records which show that he attempted suicide on August 25, 2016.  Plaintiff's claim

21  that he was not violating PIP policy also fails to create a triable issue of material fact as to whether

22  he should have been allowed to cover his windows.  It is undisputed that Plaintiff's window

23  coverings made it difficult for healthcare staff to see him.  *See, e.g.*, Trenbeath Decl., Ex. B at

24  AGO 040 (Dkt. No. 95-13 at 44) (notation on 8/30/16: "Hawthorne spent all of 1W shift with

25  partial coverage of his windows making it difficult to see him at night"); *id.* at AGO 041 (Dkt. No.

26  95-13 at 45) (notation on 9/1/16: "This staff asked I/P to take down brown paper off window.  I/P

27  refused . . .   Brown paper on window impairs visibility while doing Q12-15 minute safety

28  rounds"); *id.* at AGO 042 (Dkt. No. 95-13 at 46) (notation on 9/2/16: "I/P continues pattern of

United States District Court
Northern District of California

18

1  pasting brown paper and other types of cover to obstruct at least 50% of vision.").

2  Applying the four *Turner* factors, the Court finds that the September 9, 2016 property

3  confiscation was reasonably related to the prison's legitimate penological goal of ensuring

4  Plaintiff's safety. *See Shephard*, 840 F.3d at 692 ("unharmed prisoners" is legitimate correctional

5  goal). It is undisputed that, in the two weeks prior to his August 25, 2016 suicide attempt and in

6  the two weeks after his suicide attempt, Plaintiff repeatedly refused to stop covering his windows;

7  that Plaintiff had a recent history of self-harm and repeatedly threatened to kill himself; that

8  Plaintiff was provided an alternative means of shielding himself from view when bathing or using

9  the toilet, and that, after the property removal, Plaintiff's treatment team allowed him access to his

10  legal documents in a controlled setting outside of his cell. The directive to remove all loose papers

11  was rationally related to ensuring Plaintiff's safety since Plaintiff had a recent history of self-harm

12  and the window coverings limited healthcare officials' ability to monitor Plaintiff and determine if

13  he had harmed himself. The treatment team provided Plaintiff an alternative avenue to exercise

14  his right to access the courts, allowing him at least 50 minutes daily with his legal materials in a

15  controlled setting. The treatment team also provided Plaintiff with an alternative avenue to ensure

16  his privacy, allowing him to request a screen for when he used the bathroom. Allowing Plaintiff

17  to keep his legal materials would limit the ability of correctional officials to ensure his safety

18  because the legal materials could be used to cover the windows. There were no easy and obvious

19  alternatives to confiscating Plaintiff's loose papers, given that Plaintiff had been allowed to keep

20  his loose papers for the month prior and had repeatedly covered his windows with papers despite

21  being reminded of the PIP policy and instructed to remove the coverings.

22  Viewing the record in the light most favorable to Plaintiff, the Court finds that no

23  reasonable jury could find that defendant Thomas ordered the September 8 or 9, 2016 property

24  confiscation because of Plaintiff's protected conduct, or that the September 8 or 9, 2016 property

25  confiscation did not advance the legitimate penological interest of ensuring Plaintiff's safety. The

26  Court GRANTS summary judgment in favor of defendant Thomas on the First Amendment

27  retaliation claim.

28  //

### 2.     Access to Court Claim Against Defendant Thomas

#### a.     Legal Standard

The Ninth Circuit has held that inmates have a right, protected by the First Amendment right to petition and the Fourteenth Amendment right to substantive due process, "to pursue legal redress for claims that have a reasonable basis in law or fact." *Silva v. Di Vittorio*, 658 F.3d 1090, 1103 (9th Cir. 2011), *overruled on other grounds as stated by Richey v. Dahne*, 807 F.3d 1202, 1209 n.6 (9th Cir. 2015). This right forbids states from erecting barriers that impede the right of access of incarcerated persons. *Id.* With respect to a claim regarding active interference by prison officials, a prisoner alleges an actual injury if, as a result of the defendants' alleged actions, his pending suit was dismissed. *See Silva*, 658 F.3d at 1103-04. Actual injury is a jurisdictional requirement that flows from the standing doctrine and may not be waived. *Nev. Dep't. of Corrections v. Greene*, 648 F.3d 1014, 1018 (9th Cir. 2011). It is "actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or to present a claim." *See Lewis v. Casey*, 518 U.S. 343, 348 (1996).

#### b.     Analysis

Viewing the record in the light most favorable to Plaintiff, the Court finds that Plaintiff's access to the courts claim fails on the merits. Plaintiff has not shown that he suffered actual prejudice from defendant Thomas' confiscation of his claim. Plaintiff was able to file this action on or about August 25, 2017. The delay in filing the complaint with the Court cannot be attributed to the September 9, 2016 confiscation of Plaintiff's legal property. The complaint filed includes claims that occurred after September 9, 2016 and indicates that Plaintiff was still pursuing administrative remedies for some of these claims in early 2017. *See, e.g.,* Dkt. No. 1 at 22-25 (alleging that correctional officers failed to return his property in response to his October 2016 requests); *id.* at 56 (third level denial of grievance dated April 4, 2017). The Court therefore GRANTS summary judgment in favor of defendant Thomas on the access-to-the-courts claim.

### 3.     Qualified Immunity

Qualified immunity is an entitlement, provided to government officials in the exercise of their duties, not to stand trial or face the other burdens of litigation. *Saucier v. Katz*, 533 U.S. 194,

20

200 (2001). The doctrine of qualified immunity attempts to balance two important and sometimes competing interests — "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted).  The doctrine thus intends to take into account the real-world demands on officials in order to allow them to act "'swiftly and firmly'" in situations where the rules governing their actions are often "'voluminous, ambiguous, and contradictory.'" *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) (citing *Davis v. Scherer*, 468 U.S. 183, 196 (1984)). "The purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Id.*  To determine whether an officer is entitled to qualified immunity, the Court must consider whether (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the incident. *Pearson*, 555 U.S. at 232.  Courts are not required to address the two qualified immunity issues in any particular order, and instead may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.  Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.  Because there was no violation of Plaintiff's constitutional rights, as explained above, there is no need for further inquiry concerning qualified immunity.  *Saucier*, 533 U.S. at 201.

//

//

//

//

//

//

**CONCLUSION**

The Court GRANTS Defendants' motion for summary judgment.  Dkt. No. 95.  The claims against defendant Swensen are DISMISSED for failure to exhaust administrative remedies. This dismissal is without prejudice to bringing a new action raising the claims against defendant Swensen after Plaintiff has exhausted his administrative remedies.  The Clerk shall enter judgment in favor of Defendants and against Plaintiff, and close the case.

This order terminates Dkt. No. 95.

**IT IS SO ORDERED.**

Dated:    3/7/2023

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California